Nelson Abbott (6695)
Abbott Law Firm
3651 North 100 East, Ste. 350
Provo, Utah 84604
801-374-3000
801-850-9292 fax
nelson@abbottlawfirm.com

**LIFSHITZ & MILLER LLP**
Joshua M. Lifshitz (*to be admitted pro hac vice*)
821 Franklin Avenue, Suite 209
Garden City, New York 11530
Telephone: (516) 493-9780
Facsimile: (516) 280-7376
Email: jml@jlclasslaw.com

Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **MICHAEL INFORZATO, Derivatively and on Behalf of Nominal Defendant LifeVantage Corporation,**<br><br>Plaintiff(s),<br><br>vs.<br><br>**DARREN JENSEN, DAVID S. MANOVICH, DAVE TOOLE, GARRY MAURO, GEORGE E. METZGER, MICHAEL A. BEINDORFF, RICHARD OKUMOTO, MARK JAGGI, RAYMOND B. GREER, VINAYAK R. HEGDE and DARWIN K. LEWIS,**<br><br>Defendant(s).<br>and<br><br>**LIFEVANTAGE CORPORATION,**<br><br>Nominal Defendant.** | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND JURY DEMAND**<br><br>Case No.<br><br>Judge |

Plaintiff Michael Inforzato ("Plaintiff"), by and through his undersigned attorneys, brings this shareholder derivative action for the benefit of Nominal Defendant, LifeVantage Corporation ("LifeVantage" or the "Company"), against certain current and former officers and members of the Company's board of directors (the "Board") seeking to remedy defendants' violations of §14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and breaches of fiduciary duty.  Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by LifeVantage and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the defendants (as defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on LifeVantage's website concerning the Company's public statements; (d) review of the pleadings and other documents in the securities class action lawsuit captioned In re LifeVantage Corporation Securities Litigation, Case No. 2:16-cv-00965-TS (D. Ut.) (the "Securities Class Action"); (e) review of the pleadings and other documents in the shareholder derivative actions captioned In re LifeVantage Corp. Derivative Litigation, Case No. 160906320 MI (Ut. Dist. Ct.) and Hansen v. Jensen, et al., Case No. 2:17-cv-00075-DN (D. Ut.) (collectively, the "shareholder derivative actions"); and (f) review of other publicly available information concerning LifeVantage and the defendants.

## NATURE OF THE ACTION

1.  This is a shareholder derivative action on behalf of Nominal Defendant LifeVantage seeking to recover damages caused by defendants' breaches of fiduciary duty and violations of the

federal securities laws and to pursue remedies under § 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder against certain current and former executive officers and directors of LifeVantage.  Plaintiff brings this action as a result of defendants causing the Company to issue materially misleading statements and/or omit material information concerning the costs and expected sales of LifeVantage products in international markets from approximately September 1, 2015 until the present (the "Relevant Period").[1]

2. LifeVantage develops and sells dietary supplements and skin care products. In late-2008 or early-2009, the Company transitioned its business model away from a traditional retail model to a multi-level marketing ("MLM") approach.  The MLM approach utilizes "network marketing" or "direct selling" to sell its products through a network of independent distributors.  The independent distributors are charged with not only selling the Company's products but also with recruiting additional independent distributors to grow the network.

3. Throughout the Relevant Period, defendants caused the Company to issue in its public filings false and misleading statements and/or omit material information concerning, among other things, that: (i) LifeVantage lacked effective internal financial controls; (ii) LifeVantage improperly accounted for sales and revenues in certain international markets after the Company transitioned to the MLM sales structure; (iii) that the Company was engaging in MLM sales structure activities in countries that outlawed such activities; and (iii) as a result of the foregoing, LifeVantage's public statements were materially false and misleading at all relevant times.

---

[1] The false and misleading statements were issued in the Company's public filings from approximately September 1, 2015 to January 18, 2017; however, the wrongs complained of herein continue through to the present as LifeVantage's internal controls remain deficient.

4. The truth concerning LifeVantage's inadequate internal controls and accounting of revenues in certain international markets began to surface on September 13, 2016, when the Company announced that it would have to delay the filing of the Company's fourth quarter and full year fiscal 2016 financial results.  LifeVantage stated that this delay was the result of the Company being "currently unable to estimate the impact of the review to net revenue, tax expense, net income or other aspects of its financial statements for the fiscal year ended June 30, 2016 or any potential prior periods." LifeVantage further stated that it was "in the process of reviewing its sales into certain international markets and the revenue and income tax accruals associated with such sales[,]" including "the deductibility of commission and incentive expenses associated with such sales, as well as the policies and procedures related to sales in those specific markets."

5. As a result, LifeVantage stated that the Audit Committee of the Board was purportedly "conducting an independent review of these matters and has retained independent counsel to assist in that review[,]" and that the Company would not be in a position to release the financial results for the fiscal year ended June 30, 2016 until the review by the Audit Committee was completed.

6. Later, on September 30, 2016, LifeVantage announced that the Company had received a letter from NASDAQ stating the Company was not in compliance with Listing Rule 5250(c)(1) as a result of the Company's delay in the filing of its fourth quarter and fiscal year 2016 financial results. This rule requires NASDAQ listed companies to timely file all required periodic financial reports with the SEC.

7.  As a result of the defendants' conduct, LifeVantage's common stock traded at artificially inflated levels during the Relevant Period.  On the news of the Company's inability to timely report financial results and the truth concerning the Company's internal controls came to light, the Company's stock dropped $1.32 per share on September 13, 2016, or approximately 12.79%, to close at $9.08 per share on September 14, 2016, on unusually heavy volume.

## JURISDICTION AND VENUE

8.  This Court has jurisdiction over the claims asserted herein under 28 U.S.C. §1331 because the claims arise under and pursuant to §14(a) of the Exchange Act (15 U.S.C. §78n(a)) and Rule 14a-9 promulgated there under (17 C.F.R. §240.14a-9).

9.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a) as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

10. Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and defendants have received substantial compensation within this District by doing business here and engaging in numerous activities that had an effect in this jurisdiction.  Each defendant is an individual who is a citizen of Utah or a corporation conducting business and/or maintaining operations in this District or has such sufficient minimum contacts with this District to justify the exercise of jurisdiction over them. Further, LifeVantage maintains its principal executive offices in this District.

## THE PARTIES

11. Plaintiff is, and was, a shareholder of LifeVantage during the time defendants were breaching their fiduciary duties.   Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.

12. Nominal Defendant LifeVantage is a Colorado corporation with its principal executive offices located at 9785 S. Monroe Street, Suite 300, Sandy, Utah 84070, which was previously known as Andraplex Corporation, Yaak River Resources, Inc., Lifeline Therapeutics, Inc., and Lifeline Nutraceuticals Corp.

13. Defendant Darren Jensen ("Jensen") has been a director of the Company since January 2016 and the President and Chief Executive Officer ("CEO") of LifeVantage since May 2015.   In his role as President and CEO of LifeVantage for fiscal years 2016 and 2015, defendant Jensen received $2,602,828 and $1,152,164 in total compensation,[2] respectively.   Defendant Jensen oversaw and signed or authorized the signing of the materially misleading financial statements described herein and referenced in the 2016 and 2017 Proxy Statements (defined below).

14. Defendant David S. Manovich ("Manovich") was a director of the Company from January 2012 until his resignation on February 16, 2017.   Throughout the Relevant Period, defendant Manovich was the Chair of the Nominating and Governance Committee and a member of the Compensation Committee.   Defendant Manovich oversaw and signed or authorized the signing of the materially misleading financial statements described herein and referenced in the 2016 and 2017 Proxy Statements.

---

[2] Total compensation includes salary, bonus, stock awards, non-equity plan compensation and all other compensation.

15. Defendant Dave Toole ("Toole") has been a director of the Company since January 2016 and is a member of the Nominating and Governance Committee and the Strategic Planning Committee.  Defendant Toole oversaw and signed or authorized the signing of the materially misleading financial statements described herein and referenced in the 2016 and 2017 Proxy Statements.

16. Defendant Garry Mauro ("Mauro") has been a director of the Company since April 2008 and the Chairman of the Board since November 2013.  Defendant Mauro is a member of the Audit Committee.  Defendant Mauro oversaw and signed or authorized the signing of the materially misleading financial statements described herein and referenced in the 2016 and 2017 Proxy Statements.

17. Defendant George E. Metzger ("Metzger") has been a director of the Company since January 2012 and is the Chair of the Compensation Committee.  Defendant Metzger oversaw and signed or authorized the signing of the materially misleading financial statements described herein and referenced in the 2016 and 2017 Proxy Statements.

18. Defendant Michael A. Beindorff ("Beindorff") has been a director of the Company since January 2012.  Defendant Beindorff is the Chair of the Strategic Planning Committee and a member of the Audit Committee, Nominating and Governance Committee and the Compensation Committee.  Defendant Beindorff oversaw and signed or authorized the signing of the materially misleading financial statements described herein and referenced in the 2016 and 2017 Proxy Statements.

19. Defendant Richard Okumoto ("Okumoto") has been a director of the Company since November 2012 and is the Chair of the Audit Committee and a member of the Strategic

Planning Committee.  Defendant Okumoto oversaw and signed or authorized the signing of the materially misleading financial statements described herein and referenced in the 2016 and 2017 Proxy Statements.

20. Defendant Raymond B. Greer ("Greer") was voted to be a member of the Board at the 2017 shareholder meeting held on February 16, 2017.

21. Defendant Vinayak R. Hegde ("Hegde") was voted to be a member of the Board at the 2017 shareholder meeting held on February 16, 2017.

22. Defendant Darwin K. Lewis ("Lewis") was voted to be a member of the Board at the 2017 shareholder meeting held on February 16, 2017.

23. Defendants Jensen, Toole, Mauro, Metzger, Beindorff, Okumoto, Greer, Hegde and Lewis are collectively referred to herein as the "Director Defendants."

24. Defendant Mark Jaggi ("Jaggi") was the Chief Financial Officer ("CFO") and Treasurer of LifeVantage from August 2015 until the Company terminated his employment on January 18, 2017.

25. The Director Defendants, defendant Manovich and defendant Jaggi are collectively referred to herein as the "defendants."

### DUTIES OF THE DEFENDANTS

26. By reason of their positions as officers, directors and/or fiduciaries of LifeVantage during the Relevant Period and because of their ability to control the business and corporate affairs of the Company, the defendants owed LifeVantage and its shareholders fiduciary obligations of good faith, loyalty and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner. The defendants were

and are required to act in furtherance of the best interests of LifeVantage and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

27. Each director and officer of the Company owes to LifeVantage and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company's affairs and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

28. The defendants, because of their positions of control and authority as directors and/or officers of LifeVantage, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Due to their positions with LifeVantage, each of the defendants had knowledge of material non-public information regarding the Company.

29. To discharge their duties, the defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of LifeVantage were required to, among other things:

    a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.  Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal, state and foreign laws, rules, regulations and requirements, and all contractual

obligations, including acting only within the scope of its legal authority;

c. Exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company.

30. Moreover, LifeVantage maintains a Code of Business Conduct and Ethics, as adopted by the Board on May 28, 2014, (the "Code of Ethics"),[3] which applies to all the Company's officers and employees and members of the Board.  The purpose of the Code of Ethics is to promote the honest and ethical conduct of these Company senior executives and members of the Board, to provide information that is accurate, complete, objective, relevant, timely and understandable disclosures in reports and documents required to be filed or submitted to governmental agencies or in public communications made by the Company and to promote compliance with all applicable rules and regulations that apply to the Company and its officers.

31. The Code of Ethics state, in relevant part:

**Record-Keeping**

In addition, if you are in any way involved in preparing the Company's disclosure documents (such as SEC filings or press releases), you must produce full, fair, accurate, timely and understandable disclosure in such documents.

---

[3] Available at http://files.shareholder.com/downloads/AMDAI7OG4/3928324639x0x509675/5B A0478C-DC1A-4EC4-B80B 7DA32137939A/lifevantage_conduct_2014_updated.pdf.

32. According to the Company's proxy statement filed on Form DEF14A with the SEC on January 4, 2017 (the "2017 Proxy Statement"), the Company's Audit Committee is responsible for assisting the Board in its oversight of: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the qualifications and independence of the Company's registered public accounting firm; and (iv) the performance of the Company's internal audit function and independent registered public accounting firm.

33. During the Relevant Period, Defendants Beindorff, Mauro and Okumoto served on the Company's Audit Committee.  Additionally, the Board designated Defendant Okumoto as the "audit committee financial expert" in accordance with the rules and regulations promulgated by the SEC and NASDAQ.  As members of the Audit Committee, Defendants Beindorff, Mauro and Okumoto had an affirmative duty of oversight and responsibility for the integrity of the Company's financial reporting process.

34. As set forth in the 2017 Proxy Statement, the Company's Audit Committee is governed by the Audit Committee Charter, adopted by the Board on November 18, 2011,[4] which provides that "the [Audit] Committee is established by the Board to (1) assist Board oversight of (a) the integrity of the Company's financial statements, (b) the Company's compliance with legal and regulatory requirements and (c) the independent auditor's qualifications and independence, (d) the performance of the Company's internal audit function and independent auditors; (2) prepare an audit committee report as required by the [] SEC to be included in

---

[4] Available at http://files.shareholder.com/downloads/AMDA-I7OG4/3928324639x0x523817/8 D30D27A-8D92-460A-BB82-6AC93BA2C180/LFVN_Audit_Committee_Charter_.pdf.

the Company's annual proxy statement; and (3) perform the duties and have the

responsibilities and powers set forth herein.

35. The Audit Committee Charter provides the following, in relevant part:

### RESPONSIBILITIES

The Committee's responsibility is to oversee the accounting and financial reporting processes of the Company and audits of its financial statements and the effectiveness of the Company's internal control over financial reporting.

\*　　\*　　\*

### SPECIFIC FUNCTIONS

The Committee shall:

\*　　\*　　\*

(e) Prior to public release, review the Company's annual audited financial statements and any certificate, review, opinion or report of the independent auditor thereon and management's discussion and analysis thereon with management and the independent auditor, together and separately, and discuss with management and the independent auditor significant issues encountered in the course of the audit work, including: major issues regarding accounting and auditing principles and practices; restrictions on the scope of activities; access to required information; the adequacy of internal controls; and the adequacy of the disclosure of off-balance sheet transactions, arrangements, obligations and relationships in reports filed with the SEC.

\*　　\*　　\*

(g) Review an analysis prepared by management and the independent auditor of significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements.

### SUSTANTIVE ALLEGATION

### Background of the Company and its Multi-Level Marketing Approach

36. LifeVantage develops and sells nutraceutical dietary supplements and skin care products.

37. In late-2008 or early-2009, the Company announced a transition in its business model away from a traditional retail model to a multi-level marketing ("MLM") approach utilizing "network marketing" or "direct selling" to sell its products through a network of independent distributors.  The independent distributors are charged with not only selling the Company's products but also with recruiting additional independent distributors to grow the network.

The Company describes an "independent distributor" as "someone who participates in our network marketing business opportunity by purchasing our products at wholesale prices and selling our products to others."   Further, "active independent distributors" are defined as "independent distributors who have purchased product from us for retail or personal consumption during the prior three months."

38. According to the Company's annual report on Form 10-K for the fiscal year ended June 30, 2015 (the "2015 10-K"), the Company's compensation policy for independent distributors is as follows:

> An independent distributor creates multiple levels of compensation by selling our products and enrolling new independent distributors who sell our products. These newly enrolled independent distributors form a "downline" for the independent distributor who enrolled them. If downline independent distributors enroll new independent distributors who purchase our products, they create additional levels of compensation and their downline independent distributors remain in the same downline network as the original enrolling independent distributor. We pay commissions only upon the sale of our products. We do not pay commissions for enrolling independent distributors.[5]

---

[5] All emphasis added unless otherwise noted.

39. Further, according to the 2015 10-K, "independent distributors earn compensation on their product sales and product sales made by independent distributors within their sales organization, or 'downline,'" and can "also earn money by purchasing product from us at our wholesale cost and selling that product to others at the retail cost."

40. This MLM approach incentivizes independent distributors to not only sell the Company's products, but recruit more third parties to act as independent distributors.  Rather than relying upon the merits of a product and the promotion thereof to drive sales, MLM systems are primarily driven by motivating an independent contractor workforce with promises of exponentially increasing profits derived by enlisting more independent contractor salespeople.  Since the independent contractors are required to purchase a minimum amount of product per month to retain their status – and the dream of building a huge network of downstream salespeople generating commissions for them – MLM systems expand sales rapidly by making the salespeople the ultimate consumers.

41. Utilizing the MLM approach, the Company grew rapidly with $4.14 million in revenues in 2009; $11.48 revenues in 2010; $38.92 revenues in 2011; $126.18 revenues in 2012; $208.18 revenues in 2013 and $213.97 revenues in 2014.

42. Many countries outlaw MLM sales schemes due to their Ponzi scheme like effects.  As a result of encountering legal prohibitions in different countries, the Company saw a decline in sales starting in 2015, during which year the Company's revenues dropped to $190.34 million.  The Company experienced the worst of the decline in revenue in Japan, having generated $62 million in 2014, but only $42 million in 2015 and $36 million in 2016.

43. In an effort to regain its high and growing sales revenues, despite the legal constraints the Company encountered overseas, the Board brought in a new management team in 2015, including the President and CEO, CFO, Chief Sales Officer, Chief Science Officer and General Counsel.

44. Between February 2, 2015 and November 2015, the Company experienced significant turnover, which was later revealed in the Company's annual report on Form 10-K for fiscal year 2016 (the "2016 10-K") to likely be the result of "material weakness in [LifeVantage's] internal control over financial reporting related to [LifeVantage's] business policies, practices, monitoring and training governing our international business operations."

45. Such turnover included the following: on February 2, 2015, Douglas C. Robinson resigned from his roles as CEO, President and Board member and defendant Manovich was appointed to the position of Executive Vice Chairman; on April 29, 2015, defendant Jensen was appointed to be the President and CEO, effective May 18, 2015; on May 5, 2015, the Company announced it eliminated the General Counsel position and terminated Robert H. Cutler, General Counsel and corporate secretary, effective May 8, 2015; on July 2, 2015, the Company terminated David Colbert, the CFO and Treasurer; on August 24, 2015, the Company appointed defendant Jaggi to the position of CFO and Treasurer; on July 22, 2015, the Company appointed Justin Rose to the position of Chief Science Officer; and, in November 2015, the Company appointed Ryan Goodwin to the position of Chief Marking Officer.

46. LifeVantage continued to experience turnover approximately five months later, when, on April 13, 2016, the Audit Committee hired BDO USA, LLP ("BDO") to act as its new

independent auditor, effective April 12, 2016.  However, even the independent auditor did not last long.  On July 13, 2016, the Audit Committee dismissed BDO and engaged WSRP, LLC to act as independent auditor.

### The Company Issued False and Misleading Statements and/or Omitted Material Information Throughout the Relevant Period

47. Throughout the Relevant Period, defendants caused the Company to issue materially misleading statements and/or omit adverse material information concerning the Company's business, operations and internal controls.  In particular, the Company issued false and misleading statements that its internal controls were adequate and that defendants monitored and "systematically" reviewed potential wrongdoing by independent distributors in the MLM sales approach through the Company's internal compliance department.  However, the Company lacked the most fundamental internal controls over its international independent distributors and its compliance with applicable laws and regulations.

48. On September 1, 2015, the Company hosted a conference call with analysts and investors concerning LifeVantage's financial results for the fourth quarter of 2015 and filed its annual report on Form 10-K with the SEC for the fiscal year ended June 30, 2015 (the "2015 10-K").

49.  During the conference call, defendant Jensen discussed his "eight point plan" to turn the Company around following declining revenues and significant management transition.

50. In the 2015 10-K, under the section entitled "Our Competitive Advantages," the Company stated, in pertinent part:

> **Our Culture:** We are committed to creating a culture for our independent distributors and employees that focuses on ethical, legal and transparent business

practices. At enrollment, our independent distributors agree to abide by our policies and procedures. *Our policies and procedures, when followed, ensure that our independent distributors comply with applicable laws and regulations. Our compliance department monitors the activities of our independent distributors as part of our effort to enforce our policies and procedures.* Similarly, our code of business conduct and ethics sets forth guidelines and expectations for our employees. We believe our ethical, legal and transparent culture attracts highly qualified employees and independent distributors who share our commitment to these principles.

*       *       *

**Distributor Compliance Activities**

Given that our independent distributors are independent contractors, we do not control or direct their promotional efforts. We do, however, require that our independent distributors abide by policies and procedures that require them to act in an ethical manner and in compliance with applicable laws and regulations. As a member of the United States Direct Selling Association and similar organizations in many of the markets where we do business, we are also subject to the ethical business practices and consumer service standards required by the industry's code of ethics.

Independent distributors must represent to us that their receipt of commissions is based on retail sales and substantial personal sales efforts. We must produce or pre-approve all sales aids used by distributors such as brochures and online materials. *Products may be promoted only by personal contact or by collateral materials produced or approved by us.* Independent distributors may not use our trademarks or other intellectual property without our consent.

*We monitor and systematically review alleged independent distributor misbehavior through our internal compliance department.* If we determine one of our independent distributors has violated any of our policies and procedures, we may discipline the independent distributor and may terminate the independent distributor's rights to distribute our products. When necessary, we have brought legal action against independent distributors, or former independent distributors, to enforce our policies and procedures. Short of termination or legal action, we may impose sanctions against independent distributors whose actions are in violation of our policies and procedures. Such sanctions may include warnings, probation, withdrawal or denial of an award, suspension of privileges of a distributorship, fines and/or withholding of commissions until specified conditions are satisfied, or other appropriate injunctive relief.

51. Further, under the section entitled "Risk Factors," the 2015 10-K stated, in pertinent part:

> Extensive federal, state, local and international laws regulate our business, products and direct selling activities. Because we have expanded into foreign countries, *our policies and procedures for our independent distributors differ slightly in some countries due to the different legal requirements of each country in which we do business.*
>
> *      *      *
>
> Our independent distributors are not employees and act independent of us. However, activities by our independent distributors that violate applicable laws or regulations could result in government or third-party actions against us, which could harm our business. *Our independent distributors agree to abide by our strict policies and procedures designed to ensure our independent distributors will comply with legal requirements. We have a compliance department that addresses violations of our independent distributors when they become known to us.* However, given the size of our independent distributor network, we experience problems with independent distributors violating our policies and procedures from time to time and are not always able to discover or remedy such violations.

52. The 2015 10-K was signed by defendants Jensen, Jaggi, Mauro, Beindorff, Manovich, Metzger and Okumoto and contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Jensen and Jaggi stating that the information contained in the 2015 10-K fairly presented, in all material respects, the financial condition and results of operations of the Company, and fully complied with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act").

53. The SOX certifications stated as follows:

> 1.      I have reviewed this Annual Report on Form 10-K of LifeVantage Corporation;
>
> 2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not

misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a- 15(f) and 15d-15(f)) for the registrant and have:

   a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a.  All significant deficiencies and material weaknesses in the design or

operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

54. The statements in the 2015 10-K were false and misleading and/or omitted material information because they represented that the Company had policies and procedures that differed in appropriate ways in "each country in which we do business," that the Company's compliance department monitored the distributors and enforced these policies, and that the Company had otherwise adopted controls capable of providing reasonable assurance that these policies were being followed.  However, as later revealed, the Company lacked the most fundamental internal controls over its international distributors and its compliance with applicable laws and regulations.

55. On September 11, 2015, the Company filed its proxy statement on Form DEF 14A with the SEC for the 2016 annual meeting of shareholders (the "2016 Proxy").  The 2016 Proxy included a section entitled "Audit Committee Report," which stated, among other things, that the Audit Committee "has reviewed and discussed the consolidated financial statements with management and [LifeVantage's] independent public accounting firm."  Further, as stated in the 2016 Proxy, the Audit Committee "recommended to [LifeVantage's] board of directors the inclusion of the audited consolidated financial statements in [LifeVantage's] annual report on Form 10-K for the year ended June 30, 2015, for filing with the SEC."

56. As described above, the 2016 Proxy was materially misleading and/or omitted to disclose material information concerning, among other things, that: (i) the Company lacked effective internal financial controls; (ii) LifeVantage improperly accounted for sales and revenues in

certain international markets; and (iii) as a result, LifeVantage's public statements were false and misleading at all relevant times.

57. In describing the Company's compensation policy for officers and directors, the 2016 Proxy states that LifeVantage "actively seek[s] to foster a pay-for-performance environment…." However, the 2016 Proxy states that the Company failed to meet its performance targets required for awards to be paid under the Company's 2015 annual incentive plan and, as a result, none of the Company's executive officers earned or were paid an award under the 2015 annual incentive plan.  Thus, after being unable to receive performance awards in 2015, certain of the defendants who stood to receive performance based awards under the Company's annual incentive plan had the motive to cause the Company to issue false and misleading statements and/or omit material adverse information concerning the Company's internal financial controls in order to receive those performance awards in 2016. As such, the 2016 Proxy omitted material information concerning the Company's true compliance policies and controls which could affect performance and is tied directly to the directors' and officers' compensation.

58. On November 4, 2015, the Company issued a press release and filed a current report on Form 8-K with the SEC announcing its financial results for the first quarter of 2016.  In the press release, defendant Jensen stated:

> Our first quarter results were in-line with our expectations and reflect stability in our revenue and operating results…*In the quarter, we made progress on our growth plan that focuses on critical aspects of our business, including the launch of new technologies, brand differentiation, the introduction of new products, and international growth.* Based on our year-to-date results and outlook for the remainder of the year, we are reiterating our annual guidance and continue to

expect to achieve revenue, operating margin, and net income improvements in fiscal 2016.

59. Also on November 4, 2015, the Company filed its quarterly report on Form 10-Q with the SEC for the first fiscal quarter of 2016 (the "Q1 2016 10-Q"). The Q1 2016 10-Q reiterated the financial and operating results in the press release for first fiscal quarter of 2016. The Q1 2016 10-Q was signed by defendants Jensen and Jaggi and contained signed certifications pursuant to SOX by defendants Jensen and Jaggi.

60. On November 4, 2015, the Company's stock closed at $7.78 per share.

61. On February 9, 2016, the Company issued a press release and filed a current report on Form 8-K with the SEC announcing its financial results for the second quarter of 2016. In the press release, defendant Jensen stated:

> **We continue to make progress across all aspects of our growth plan**, including investments in distributor leadership development, mobile technology with the introduction of new business building technologies, new products, brand development, and international expansion. Our strategic plan focuses on changing the revenue trends to a positive trajectory and we are pleased that revenue is responding to these investments. Nevertheless, these investments will impact our operating income results in the near-term. However, we are confident that investing in our future growth will better position our company to capitalize on opportunities ahead and achieve accelerated sales growth.

62. Also on February 9, 2016, the Company filed its quarterly report on Form 10-Q with the SEC for the second fiscal quarter of 2016 (the "Q2 2016 10-Q"). The Q2 2016 10-Q reiterated the financial and operating results in the press release for second fiscal quarter of 2016. The Q2 2016 10-Q was signed by defendants Jensen and Jaggi and contained signed certifications pursuant to SOX by defendants Jensen and Jaggi.

63. Later on February 9, 2016, the Company hosted a conference call for analysts and investors

concerning the Company's financial results for the second fiscal quarter of 2016.  During the

conference call, defendant Jensen stated, in pertinent part:

> As those of you that follow our industry are aware, the regulatory environment is constantly evolving and over the past several months, we have seen new regulatory guidance come into play. ***We have proactively taken steps to ensure that we are fully in compliance with this ever changing regulatory landscape.***
>
> Despite the fact that we are a relatively small company, when compared to others in our industry, ***we believe that we are the industry leader in terms of setting a standard for compliance***. While these investments resulted in some additional expense that was not previously factored into our guidance, we will benefit in the long term.

64. Defendant Jensen continued:

> In summary, we are encouraged by what we have accomplished in the first half of fiscal 2016, particularly our return to both year-over-year and sequential sales growth. Our growth strategy was designed to enable us to realize its benefits beginning in fiscal year 2016, with accelerated and further improvements in coming years as our initiatives take hold across our entire global organization.
>
> We launched our new products, including a new brand, *positioned our Company to enter new international markets adapted to the ever changing regulatory landscape,* and brought in new technologies that will ultimately better position our business for long-term growth.

65. On May 4, 2016, the Company issued a press release and filed a current report on Form 8-K

with the SEC announcing its financial results for the third quarter of 2016.  The press release

stated, in pertinent part:

> **Third Quarter Fiscal 2016 Results**
>
> For the third fiscal quarter ended March 31, 2016, the Company reported revenue of $56.2 million, a 24.4% increase compared to $45.2 million for the comparable period in fiscal 2015; and an 8.0% increase compared sequentially to revenue of $52.0 million for the second fiscal quarter ended December 31, 2015. Year-

overyear quarterly revenue reflects an increase of 33.8% in the Americas and a decrease in the Asia/Pacific & Europe region of 0.9%.

66. Further, in the May 4, 2016 press release, defendant Jensen stated:

> We are excited about our ***record revenue performance during the third quarter***. We are seeing positive trends in our existing business, leading up to what may be the biggest new product launch in the company's history with the upcoming May 17th cyber launch of NRF1…We are successfully combining visionary product innovation with a highly duplicatable business opportunity, further enabling our independent distributors to be successful. The results are evident in our sales growth.

67. Also on May 4, 2016, the Company filed its quarterly report on Form 10-Q with the SEC for the third fiscal quarter of 2016 (the "Q3 2016 10-Q"). The Q3 2016 10-Q reiterated the financial and operating results in the press release for third fiscal quarter of 2016. The Q3 2016 10-Q was signed by defendants Jensen and Jaggi and contained signed certifications pursuant to SOX by defendants Jensen and Jaggi.

68. On July 19, 2016, defendants caused the Company to issue an amended quarterly report on Form 10-Q with the SEC for the third fiscal quarter of 2016 (the "Amended Q3 2016 10-Q"). The Amended Q3 2016 10-Q stated, in pertinent part:

> This Amendment No. 1 to the Quarterly Report on Form 10-Q (the "Amendment") of Lifevantage Corporation (the "Company") for the quarterly period ended March 31, 2016, as filed with the Securities and Exchange Commission (the "SEC") on May 4, 2016 (the "Original Filing"), is being filed to disclose that our current independent registered public accounting firm, WSRP, LLC ("WSRP"), has completed its review of the unaudited interim financial information for the quarterly period ended March 31, 2016 presented in the Original Filing under Public Company Accounting Oversight Board AU 722, as required by SEC rules, and to provide new Section 906 certifications. This Amendment includes amendments of (i) Part I, Item I, to include a report from WSRP; (ii) Part II, Item 6 to include new certifications as reflected in Exhibits

31.1, 31.2, 32.1 and 32.2 and to provide an acknowledgment from WSRP
regarding the unaudited interim financial statements, as reflected in Exhibit 15.1
and (iii) Exhibit 101 to replace the related XBRL files to this Form 10-Q/A which
incorporates XBRL references to subsequent events occuring [sic] after the
original filing. No other changes have been made to the Original Filing.
Following WSRP's review, this Amendment was not, and is not required to be,
updated to reflect any events or transactions occurring after the date of the
Original Filing, or modify or update disclosures that may have been affected by
events or transactions occurring subsequent to such filing date, and, except as
described above, all information and exhibits included in the Original Filing
remain unchanged.

69. The Amended Q3 2016 10-Q reiterated the financial and operating results in the press release

for amended financial results for the third fiscal quarter of 2016.  The Amended Q3 2016 10-

Q was signed by defendants Jensen and Jaggi and contained signed certifications pursuant to

SOX by defendants Jensen and Jaggi.

70. Throughout the Relevant Period, defendants caused the Company to issue materially false

and misleading statements and/or omit material information concerning the Company's

business, operations and internal controls.  In particular, defendants caused the Company to

issue false and misleading statements and/or omit material information that: (i) the Company

lacked effective internal financial controls; (ii) LifeVantage improperly accounted for sales

and revenues in certain international markets; and (iii) as a result, LifeVantage's public

statements were false and misleading at all relevant times.

71. As a result of the false and misleading statements and material omissions by defendants in

the Company's public filings during the Relevant Period, the Company's stock price became

artificially inflated and rose to a high of $15.97 on July 12, 2016.

**The Truth Begins to Emerge**

72. On September 13, 2016, after the market closed, LifeVantage issued a press release and filed

a current report on Form 8-K with the SEC announcing a delay in the release of the

Company's financial results for the fourth fiscal quarter of 2016.  The press release stated, in

pertinent part:

> Following an internal review by Company personnel of its policies and procedures, the Company is in the process of reviewing its sales into certain international markets and the revenue and income tax accruals associated with such sales. The Company is currently unable to estimate the impact of the review to net revenue, tax expense, net income or other aspects of its financial statements for the fiscal year ended June 30, 2016 or any potential prior periods. The Audit Committee of the Company's Board of Directors is conducting an independent review of these matters and has retained independent counsel to assist in that review.
>
> The review relates to sales of the Company's products in certain international markets and the determination of revenue and the deductibility of commission and incentive expenses associated with such sales, as well as the policies and procedures related to sales in those specific markets. The Company will experience a delay in the timely filing of its Annual Report on Form 10-K for its fiscal year ended June 30, 2016 (the "Form 10-K") and expects to file a notification of late filing on Form 12b-25 with the Securities and Exchange Commission to obtain an automatic 15-day extension of the filing deadline for the Form 10-K. There can be no assurance that the Company will complete the preparation and filing of the Form 10-K within the extension period.
>
> *       *       *
>
> The Company will not be in a position to release financial results for the fiscal year ended June 30, 2016 until the independent review by the Audit Committee is completed.

73. In the September 13, 2016 press release, defendant Jensen stated:

> We regularly review our policies and procedures to ensure the utmost accuracy and transparency in our financial reporting. Our Board's Audit Committee has engaged independent external resources to review our policies and procedures and support our team in finalizing our financial results for fiscal 2016.

74. On this news, LifeVantage stock fell $1.32, or approximately 12.69%, to close at $9.08 on

September 14, 2016, on unusually heavy volume of 759,000 shares.

75. On September 20, 2016, *StreetInsider* published an article entitled "Is LifeVantage Playing

Musical Chairs With Its Audience?"[6]  The article stated that the Company "is facing many

special issues surrounding not just its products, but also concerning its financials and its

claims of great health and longevity for the consumer and his/her dog."  Further, the article

detailed the multiple changes in the Company's auditors over the past few years, and stated,

in pertinent part:

> We reviewed LifeVantage's annual financial statements (forms 10-K) filed with
> the SEC from 2008 to 2015. On January 30, 2008, the company retained the audit
> firm of EKS&H, LLLP (a firm with over 60 partners and 650 employees) as its
> independent registered public accounting firm beginning with the three months
> ended December 31, 2007. The company used EKS&H from FY 2007 through the
> filing of its 2015 annual report on September 1, 2015. On or about April 12, 2016,
> the company fired EKS&H.
>
> On April 12, 2016, the company hired BDO USA, LLP as its new independent
> public accounting firm. According to the company's press release, "The decision
> to appoint BDO followed the Audit Committee's comprehensive review of audit
> proposals from firms with the resources to support the company's broadening
> global footprint…BDO has the scale and experience to support LifeVantage's
> growth for years to come." BDO is among the top 10 largest accounting firms in
> the US.
>
> Less than three months later, on July 7th, the company announced its termination
> of BDO effective immediately because "a firm in the BDO international network
> had provided certain prohibited non-audit services as a subcontractor to a third
> party contractor who had been engaged to provide payroll services to an
> international subsidiary of the Company."
>
> A few days later on July 11th, LFVN retained WSRP, LLC as its new independent
> auditor. WSRP is a Utah-based CPA firm with approximately 14 partners and less
> than 100 employees. The company's primary reason for hiring BDO in April was
> to hire a firm large enough to "support the company's broadening global footprint."
> If that's the case, why then is the company now hiring a much smaller firm than
> both BDO and EKS&H? We will let the reader chew on that particular piece of cud
> and make a determination for him or herself.

---

[6]  *Available   at*  http://www.streetinsider.com/SI+Newswire/Is+LifeVantage+Playing+Musical
+Chairs+With+Its+Auditors%3F/12052662.html.

76. The article further discusses ongoing issues with the Company's products, stating, in

pertinent part:

> Another issue overhanging the stock it its product claims which are misleading at
> best and outright untrue at worst. LifeVantage's website claims that Dr. Joe
> McCord is "the scientist behind Protandim," the company's flagship product. The
> current version of Protandim is in fact a combination of 5 common herbal
> ingredients including turmeric and green tea. It was invented following "months of
> extensive research and development" in 2004 by Lifeline (the precursor to
> LifeVantage) employees Paul Myhill and William Driscoll, a former oil company
> executive, who together hold the patent on the product. The product was launched
> in February of 2005. Later that year, Myhill and Driscoll resigned from the
> company. The following year, biochemist Dr. Joe McCord joined the LifeVantage
> board of directors as its Director of Science. Dr. McCord served as spokesperson
> for Protandim and was responsible for distributor training and product research.
>
> On April 13th, 2012, Paul Myhill published an open letter on Facebook saying,
> LifeVantage's "communications are downright false and misleading", and
> "perpetuate an ongoing fraud - one that the SEC and FTC should be made aware
> of." To prove that his words weren't empty threats, Myhill posted proof in the form
> of a letter from McCord himself saying that he couldn't take credit for inventing
> Protandim, because "it was so close to its final embodiment prior to the beginnings
> of our association." This showed that McCord didn't take 41 ingredients and whittle
> it down to 5 as he had claimed.
>
> *       *       *
>
> What really inspires angst with us is the information regarding Protandim at the
> website ClinicalTrials.gov. The site includes 4 actual human clinical trials which
> are listed below with the corresponding results for each:
>
> [Each of the four studies described was either withdrawn or has no results posted.]
>
> Protandim doesn't seem to be the panacea for all ills as the company would have
> you believe. Rather, the 4 failed clinical trials suggest the compound is ineffective
> at best in humans and harmful at worst. There are absolutely no clinical trials to
> show that the company's product will extend life, give more youthful skin, or help
> our dog. To top it all off, the company's shares are trading at a significant premium
> above its peers. Given all of the above, a price target of $6.00 is more than generous.

77. On September 30, 2016, after the market closed, LifeVantage issued a press release and filed a current report on Form 8-K with the SEC announcing that the Company had received a letter from NASDAQ stating the Company had "60 calendar days to submit a plan to regain compliance" with Listing Rule 5250(c)(1), as a result of LifeVantage's delay in filing its annual report.  NASDAQ Listing Rule 5250(c)(1) "requires NASDAQ listed companies to timely file all required periodic financial reports with the Securities and Exchange Commission."

78. The September 30, 2016 press release further stated that the Company's Audit Committee was conducting a review of sales of LifeVantage products in certain international markets and the determination of revenue and the deductibility of commission and incentive expenses associated with such sales, as well as the policies and procedures related to sales in those specific markets.

79. On November 10, 2016, after the market closed, the Company filed a Notification of Late Filing on Form 12b-25 with the SEC stating that it was "unable to file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2016…prior to the filing deadline."

80. On this news, LifeVantage's stock fell $0.49, or approximately 5.11%, to close at $9.10 on November 11, 2016.

81. On November 18, 2016, after market close, LifeVantage issued a press release and filed a Current Report on Form 8-K, announcing that it had received a letter from NASDAQ reiterating that "the Company has until November 28, 2016 to submit a plan to regain compliance with respect to these delinquent reports."

82. On December 12, 2016, after the market closed, the Company finally filed its annual report for fiscal year 2016 on form 10-K (the "2016 10-K") and its quarterly report for the first fiscal quarter of 2017 on Form 10-Q.

83. In connection with the Audit Committee's independent review of sales in international markets, the 2016 10-K stated:

> On September 13, 2016, we announced the delayed filing of this Annual Report on Form 10-K to allow the Audit Committee of our Board of Directors to conduct an independent review related to the distribution of our products into countries outside the U.S, in which those products are not registered or that otherwise impose stringent restrictions on our direct selling model, and the associated revenue and tax and other accruals associated with such sales. This independent review was initiated following internal reviews by Company personnel and was further informed by the content of employee complaints. The Audit Committee retained independent counsel to assist it in conducting the review. Based on its independent review, the Audit Committee determined that ***(i) we had sold our products to independent distributors who carried or shipped such products primarily into four countries outside the U.S. in which those products are not registered or that otherwise impose stringent restrictions on our direct selling model; (ii) we allowed individuals who were resident in countries that impose stringent restrictions on our direct selling model to enroll as independent distributors; and (iii) we did not have in place sufficient controls governing our international business policies, practices, monitoring and training to provide reasonable assurance that such distribution of our products complied with applicable customs, tax and other regulatory requirements. The inadequate controls and processes related to the lack of documented country-specific policies and procedures governing (i) distributor enrollment policies and procedures; (ii) approved distributor payment and collection methods; (iii) methods for shipping and order fulfillment; (iv) approval requirements for transactions with distributors outside of our approved compensation plans; and (v) lack of change controls related to changes to existing country-specific policies and procedures***. In addition, we had ***inadequate controls in place related to*** the training, monitoring and oversight of our personnel who were involved in or managed our international business operations. Accordingly, we ***identified a material weakness in our internal controls over financial reporting*** as of the period ended June 30, 2016.

84. With respect to the impact on the Company's financials, the 2016 10-K stated, in pertinent part:

> In the years ended June 30, 2016 and 2015, we estimate that approximately *$17.3 million and $6.7 million in net revenue, respectively, related to sales of our products to independent distributors who may have carried or shipped such products into countries in which our products are not registered or that otherwise impose stringent restrictions on our direct selling model.*

85. The 2016 10-K also described the steps the Company was taking to address the material weakness:

> To remediate the material weakness in our internal controls over financial reporting described above, we are developing and implementing new control policies and procedures regarding the international business policies, practices, monitoring and training for each country outside the U.S. in which we do business. ***As an initial step, we implemented changes to our systems and distributor enrollment requirements intended to stop or restrict the processes used by independent distributors to purchase and carry or ship our products into countries in which those products are not registered or that otherwise impose stringent restrictions on our direct selling model***. Looking forward, we are in the process of ***developing appropriate country-specific policies and procedures to help ensure that our products are not distributed or sold into countries without complying with applicable customs, tax and other regulatory requirements***. Additional steps we have taken and are taking to remediate the material weakness in our internal controls over financial reporting include creating market-specific policy manuals documenting the following:
>
> • ***distributor enrollment requirements by country***, including the requirement of sufficient and appropriate oversight and senior management approvals for any changes to such country-specific policies;
>
> • ***approved distributor payment and collection policies by country***, including the requirement of sufficient and appropriate oversight and senior management approvals for any changes to such country-specific policies;
>
> • ***approved shipping, order fulfillment and customs import policies by countr***y, including the requirement of sufficient and appropriate oversight and senior management approvals for any changes to such country-specific policies; and

- approval requirements for transactions between us and independent distributors outside of our approved compensation plans.

In addition, as we implement country-specific policies, we are requiring that we obtain international tax and legal advice from external accounting and law firms that have relevant country-specific expertise to help ensure that potential international tax and legal issues are appropriately identified and addressed. *We have also started the process of evaluating and re- allocating personnel resources to ensure that each market has adequate resources to support our remediation efforts and our new processes and controls*. We also will establish and conduct company-wide training programs on our new policies and controls.

These actions are subject to ongoing review by our management, including our Chief Executive Officer and Chief Financial Officer, as well as oversight by our Audit Committee. Although we plan to complete this remediation process as quickly as possible, *the material weakness in our internal control over financial reporting will not be considered remediated until the applicable remedial processes and controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively. As a result, we cannot, at this time, estimate when such remediation will be completed*. In addition, the remediation steps we have taken, are taking and expect to take may not effectively remediate the material weakness, in which case our internal control over financial reporting would continue to be ineffective.

86. In the section of the 2016 10-K describing "Risk Factors," the 2016 10-K stated, in pertinent part:

This review has required us to expend significant management time and incur significant accounting, legal, and other expenses. Through the end of the first two quarters of fiscal 2017, we expect to incur between approximately $2.5 million to $3.0 million in additional selling, general and administrative expense related to the audit committee review and management's assessment of the related financial and internal control impact. In addition, through approximately the end of fiscal 2017, *we expect to incur significant additional expenses associated with the remediation of internal controls over financial reporting and managing related operational issues*.

Based on its review, the audit committee determined that (i) we had sold our products to independent distributors who carried or shipped such products primarily into four countries outside the U.S. in which those products are not

registered or that otherwise impose stringent restrictions on our direct selling model; (ii) we allowed individuals who were resident in countries that impose stringent restrictions on our direct selling model to enroll as independent distributors; and (iii) we did not have in place sufficient controls governing our international business policies, practices, monitoring and training to provide reasonable assurance that such distribution of our products complied with applicable customs, tax and other regulatory requirements. ***We have taken steps to help ensure that our products are not distributed or sold into countries without complying with applicable customs, tax and other regulatory requirements and to appropriately verify the residency of individuals who want to become our independent distributors***. Consistent with these regulatory requirements, in the future our independent distributors may be able to purchase a limited quantity of such products for personal consumption in one or more of these countries. Nevertheless, ***we expect that our revenue in future periods from sales of our products that are carried or shipped into these countries will be significantly lower than fiscal 2016***.

87. The Company provided additional details during the December 12, 2016 conference call.

Defendant Mauro, Chairman of the Board, stated:

> During the FY16 closing process, employees in our tax department raised concerns about our international policies dealing with how our products are purchased or sold in some international markets, and taxes and tariffs associated with those sales. It's important to note that these potential policy weaknesses were identified internally.

> Once the Board was notified, our audit committee initiated an independent review utilizing independent external legal counsel and independent external accounting experts. A formal SOX complaint was submitted by an employee after the review was underway, and the audit committee took this information into account and evaluated and completed due diligence on all issues raised. We analyzed transactions, policies, and procedures to determine if there were weaknesses and to determine why they may have happened.

> We aspire to best practices in all areas, and the depth of this process was to ensure just that. The questions we addressed in our review revolved around several policies and procedures concerning distributor activities in select international markets. But ***as the review progressed, the scope was expanded to a general review of our policies and procedures across all international markets***.

The type of activities reviewed included our ***products being purchased for personal consumption and being taken into markets where they had not been approved for resale***. In general, most countries have an allowance for the personal importation of items for personal use; however, we identified an increase in this type of activity that needed additional review, primarily for tariff and tax purposes. It is important that we have in place the policies, procedures, and internal systems to help ensure compliance, reduce the risk of abuse, and establish best practices well above our broader industries.

Once the review was concluded, we then took steps to implement the appropriate remedial measures. As part of this comprehensive review, we engaged international advisors with relevant country-specific expertise to help ensure our policies and procedures were appropriately aligned with local rules.

Finally, we could not issue our 10-K until all these steps were completed to ensure that we were fully compliant and to ascertain if there was any impact to our financial statements. Ultimately, other than the high cost of the external experts utilized in the review, which totaled approximately $2.5 million to $3 million, the impact to our delayed financials was negligible; however, ***we concluded that we had material weaknesses in some of our international controls, and our auditors issued an adverse opinion relating to our internal control over financial reporting***.

We have already taken action to outsource our international tax and tariff responsibilities to help remediate this weakness. Our Board of Directors and the entire LifeVantage management team are committed to transparent, accurate, and thorough financial reporting and disclosure.

While the duration of the review and filings delay was longer than we or our shareholders preferred, our number one goal was to complete a thorough and comprehensive evaluation. We utilized independent forensic accountants and outside counsel, both domestically and in international markets, to ensure thoroughness and to support our conclusions.

Our corporate philosophy is to ensure dedication to high-quality ethical business practices and financial reporting. We have now instituted best practices that will make us a stronger Company, with improved policies, procedures, and controls as a result.

88. Defendant Jensen then described "some of the remedial measures being implemented as a result of the recent review":

We are implementing changes that include enhanced support from our country-specific experts, including legal, tax, and customs advice. Given the complexity of operating in multiple international markets, we have also begun to outsource key activities where external support is more effective and efficient. Let me highlight some of the specific policy weaknesses discovered and the steps we have taken.

First, in certain markets, *the documentation and verification obtained during the enrollment process for people who wanted to become independent distributors was insufficient*. We have received local advice, and now, where necessary, require in-person verification of local resident identification.

Second, we have instituted enhanced policies regarding the purchase for personal consumption of products in markets where such products are not registered or otherwise restrict our direct selling model.

Third, *policies regarding distributor payments were not appropriately documented in some markets*. We have strengthened these policies and instituted new controls covering payments in local markets and currencies.

Fourth, transfer pricing and commissions rebalancing procedures in international markets have been refined to more effectively provide for the consistency in cross-border purposes. For example, a distributor may purchase in one market with delivery to customers in another market where pricing, currency, and commission rates could vary.

Fifth, we have structurally aligned ourselves to outsource tax and tariff advisory functions to ensure we have access to the most up-to-date market-specific expertise.

Sixth, *we have started evaluating and reallocating our personnel to ensure that each market has adequate resources to support our enhanced processes and controls*. We will also establish and conduct Company-wide training programs.

We will continue to refine and update all of our international country operating and launch policies to ensure best practices are followed. The vast majority of these enhancements will improve our controls without any measurable impact to our distributors or our sales activities.

A few of the remedies being implemented will have, and in some cases, have already had, an impact on our sales levels. This impact materialized to a modest extent during the first quarter of FY17, as initial actions were taken during the review process. *We immediately eliminated substantially all nonresident purchases worldwide.*

Additionally, ***new policies around verification of local market resident identification have interrupted sales in one market***. The impact to our in- market sales levels should be more evident in the second quarter. Our new policies will again allow nonresident purchases for personal consumption in markets where this practice is permitted.

We anticipate that in the third quarter, we will begin to regain a portion of these sales. I believe these enhanced policies and controls will provide proper guidance within which we can build our global business opportunity.

89. Defendant Jensen later added that the Company expected "second-quarter revenue in the range of $48 million to $49 million, which would be down sequentially versus the first quarter of FY17" because sales during the second quarter had been "negatively impacted by the disruption surrounding our policy changes affecting international markets."

90. As one commentator noted:

LifeVantage's assessment that 8% of revenue or around $17 million in sales in fiscal 2016 were linked to questionable international sales practices is significant. ***That amount represents 100% of the company's revenue growth over the prior year***. LifeVantage reported revenue of $207 million in 2016, up $17 million from $190 million in 2015.[7]

91. On this news, LifeVantage stock fell $1.02, or approximately 10.53%, to close at $8.67 on December 13, 2016, on usually heavy volume of 295,400 shares.

92. Around the same time, the Company also announced several management changes.

-------------------

[7] Christine Richard, *Are Investors Underestimating The Risks To Herbalife's International Business?*, Seeking Alpha (Dec. 20, 2016), *available at* http://seekingalpha.com/article/4031549-investors- underestimating-risks-herbalifes-international-business.

93. First, on December 12, 2016, after market close, the Company filed a Form 8-K announcing that defendant Jensen's employment agreement had been amended to "strengthen[] certain nonsolicitation and noncompete restrictive covenants," to "make[] explicit that a Company incentive compensation clawback policy will apply when adopted to Mr. Jensen's qualifying incentive compensation," and to reflect that defendant Jensen had "agreed to waive for future fiscal years his rights to certain cash incentive bonus awards described in his original employment agreement."

94. Second, on December 15, 2016, the Company filed a Form 8-K announcing that the Company had "terminated the employment of Robert Urban, our Chief Operating Officer."

95. On January 4, 2017, the Company filed its proxy statement on Form DEF 14A with the SEC for the 2017 annual meeting of shareholders (the "2017 Proxy Statement").  The 2017 Proxy Statement included a section entitled "Audit Committee Report," which stated, among other things, that the Audit Committee "reviewed and discussed the consolidated financial statements with management and our independent registered public accounting firm. Further, as stated in the 2016 Proxy, the Audit Committee "recommended to [LifeVantage's] board of directors the inclusion of the audited consolidated financial statements in [LifeVantage's] annual report on Form 10-K for the year ended June 30, 2016, and this Proxy Statement, for filing with the SEC."

96. As described above, the 2017 Proxy Statement was materially misleading and/or omitted to disclose material information concerning that: (i) the Company lacked effective internal financial controls; (ii) as a result, LifeVantage improperly accounted for sales and revenues

in certain international markets; and (iii) as a result, LifeVantage's public statements were false and misleading at all relevant times.

97. In describing the Company's compensation policy for officers and directors, the 2017 Proxy Statement states that LifeVantage "actively seek[s] to foster a pay-for-performance environment…." As such, the 2017 Proxy Statement omitted material information concerning the Company's true compliance policies and controls which could affect performance and is tied directly to the directors' and officers' compensation.

98. Finally, on January 18, 2017, after market close, LifeVantage issued a press release and filed a Current Report on Form 8-K announcing that it had terminated the employment of Defendant Jaggi, the Company's former CFO and had undertaken a search for a new permanent CFO. Meanwhile, the Company had appointed Gary Koos as Interim CFO. The press release also quoted Jensen as follows:

> "We are pleased to have Gary Koos join the company as Interim CFO," said LifeVantage President and Chief Executive Officer, Darren Jensen. "In addition to his international financial expertise and leadership capabilities, Gary's extensive operational skills and experience establishing enterprise-wide policies and controls will be vital as we continue to focus on creating value for our shareholders."

99. On this news, LifeVantage stock fell $0.39, or approximately 5.16%, to close at $7.17 on January 19, 2017.

100. As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, the Company has suffered and will continue to suffer significant damages.

### DAMAGES TO THE COMPANY

101. LifeVantage has been, and will continue to be, severely damaged and injured by the defendants' misconduct. As a direct and proximate result of the defendants' conduct,

LifeVantage has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

      a.   costs incurred in compensation and benefits paid to defendants that violated federal securities laws;

      b.   costs incurred defending against SEC, DOJ and other government investigations and litigation;

      c.   substantial loss of market capital;

      d.   costs already incurred and to be incurred defending the pending Securities Class Action and shareholder derivative actions; and

      e.   any fines or other liability resulting from the Company's violations of federal law.

102.    In addition, LifeVantage's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired.  The credibility and motives of management are now in serious doubt.

103.    The wrongdoing complained of herein has irreparably damaged LifeVantage's corporate image and goodwill.  For at least the foreseeable future, LifeVantage will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that LifeVantage's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

104.    Plaintiff brings this action derivatively in the right and for the benefit of LifeVantage to redress injuries suffered, and to be suffered, by LifeVantage as a direct result of violations of

federal securities laws by the Director Defendants.  LifeVantage is named as a nominal

defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction

on this Court that it would not otherwise have.

105.    The Board of LifeVantage, at the time this action was commenced, consisted of the

following nine individuals: defendants Jensen, Beindorff, Mauro, Metzger, Okumoto, Toole,

Greer, Hegde and Lewis.

106.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit

demand on the LifeVantage Board would be futile, and therefore, excused.  This is because a

majority of the Board faces a substantial likelihood of liability as a result of their scheme and

false and misleading statements and/or omissions of material adverse facts which render

them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

**Demand is Futile as to Defendant Jensen Because His Principal Professional**

**Occupation is as the Company's President and CEO**

107.    Defendant Jensen has been the President and CEO of the Company since May 2015, and

a member of the Board since January 2016.  In his role as President and CEO of the

Company for the fiscal years 2016 and 2015, defendant Jensen received $2,602,828 and

$1,152,164 in total compensation, respectively.  The Company does not claim that defendant

Jensen is an independent director and because defendant Jensen's primary source of income

and primary employment is, his employment as President and CEO of LifeVantage and his

professional reputation is inextricably bound to his role at LifeVantage, defendant Jensen is

incapable of acting independently and demand is futile upon him.

**The Director Defendants are not Impartial Because**

**they Knowingly Participated in False and Misleading Statements**

108.    LifeVantage holds itself out as a Company whose products promote health and are based

upon highly advanced medical science, informing potential investors and product purchasers,

"*We provide quality, scientifically-validated products.*"  As stated on the Company's

website:

> We say it over and over again: LifeVantage is a different kind of company. It's
> evident in our people, our products and especially in our science. Our science is
> our foundation. Our science is one of the things that sets us apart from all the rest.
> **At LifeVantage, true science is a priority.**

109.    On LifeVantage's web page there are four drop down options, "Products," "Science,"

"Company," and "Opportunity."  Under the "Science" dropdown the following endorsement

appears, "The science behind Protandim is different and unique because LifeVantage

Corporation doesn't pay for it.  In the world of research, this means that the product and its

science must be so compelling that Ph.D.s from universities around the world want to study it

and want to spend their own time and money doing it.  LifeVantage has a product other

people are paying to study!  That is unheard of, especially in the supplement industry."  The

quote is attributed to a "Dr. Skip Campbell."  Skip Campbell is Gary Dean Campbell Jr.

("Campbell"), who is a chiropractor and not a medical doctor, as represented on the

LifeVantage webpage.  Campbell's primary source of income is as one of the top dozen

earners as an independent MLM salesperson for LifeVantage.

110.    Though LifeVantage holds itself out as a Company for which "science is our foundation,"

none of the directors on the Company's Board, or any of the Company's executive officers,

have any education or prior experience in the areas of science, medical/health based science, biology or biopharmaceutical or health supplements.

111.   The Company's public representations claiming a high level of scientific knowledge applied to produce effective products, are detailed on the Company's webpage for each of its individual supposed health enhancing products.

112.   Protandim is the active ingredient in many of the Company's products.  Protandim is a combination of green tea, turmeric, ashwagandha, bacopa, and milk thistle.

113.   The herbs green tea, turmeric, ashwagandha, bacopa and milk thistle were believed to have antioxidant qualities long before LifeVantage put the five herbs together and labeled the combination "protandim."  There is no scientifically validated indication that the combination of the five components of Protandim have any particularly increased anti-oxidant or other health benefit beyond that associated with its individual components (such as green tea).  No published peer-review study has ever shown the combination of the five herbs/materials (Protandim) to be more effective as an anti-oxidant in humans than its individual components.

114.   In its patent application for Protandim, the Company represented that:

> The compositions of the present invention are useful to prevent or treat the following disorders and diseases: memory loss; Parkinson's disease; aging; toxin-induced hepatotoxicity, inflammation; liver cirrhosis; chronic hepatitis; and diabetes due to cirrhosis; indigestion; fatigue; stress; cough; infertility; tissue inflammation; cancer; anxiety disorders; panic attacks; rheumatism; pain; manic depression; alcoholic paranoia; schizophrenia; fever; insomnia; infertility; aging; skin inflammations and disorders; alcoholism; anemia; carbuncles; convalescence; emaciation; HIV; AIDS; immune system problems; lumbago; *multiple sclerosis*; muscle energy loss; paralysis; swollen glands; ulcers; breathing difficulties; inflammation; psoriasis; cancer (e.g.; prostate cancer, lung cancer and breast cancer); pain; cardiovascular disease (e.g.; arteriosclerosis and atherosclerosis); ischemia/reperfusion injury; anxiety; attention deficit disorder; leprosy; arthritis

(e.g., psoriatic arthritis; anklylosing spondvlitis; and rheumatoid arthritis); hemorrhoids; tuberculosis; high blood pressure; congestive heart failure; venous insufficiency (pooling of blood in the veins; usually in the legs); sore throat; hepatitis; syphilis; stomach ulcers; epilepsy; diarrhea; asthma; burns; piles; sunburn; wrinkles; headache; insect bites; cuts; ulcers; sores; herpes; jaundice; bursitis; canker sores; sore gums; poison ivy; gastritis; high cholesterol; heart disease; bacterial infection; viral infection; acne; aging; immune disorders; dental caries; periodontitis; halitosis; dandruff; cardiovascular disease (e.g., hypertension; thrombosis; arteriosclerosis); migraine headaches; diabetes; elevated blood glucose; diseases of the alimentary canal and respiratory system; age-related physical and mental deterioration (e.g., Alzheimer's Disease and age-related dementia); cardiovascular disease; cerebral vascular insufficiency and impaired cerebral performance; congestive symptoms of premenstrual syndrome; allergies; age-related vision loss; depression; Raynaud's disease; peripheral vascular disease; intermittent claudication; vertigo; equilibrium disorder; prevention of altitude sickness; tinnitus (ringing in the ear); liver fibrosis; macular degeneration; asthma; graft rejection; and immune disorders that induce toxic shock; bronchoulmonary disease as cystic fibrosis; chronic bronchitis; gastritis; heart attack; angina pectoris; chronic obstructive pulmonary disease; kidney damage during coronary angiography; Unverricht-Lundborg disease; pseudoporphyria; pneumonia; and paracetamol hepatotoxicity.

115.   The Director Defendants are presumed to have a basic knowledge of the Company on whose Board they serve and are presumed to have been familiar with the Company's claims regarding the supposed scientific foundation of its products.  Given the lack of any scientific knowledge or experience on the Board, the Director Defendants understood that the Company's focus was on expanding the MLM sales structure via independent distributors, rather than the actual products.

116.   None of the executive officers have scientific background and the Company does not employee any full time scientist.

117.   Given the Director Defendants' lack of education or experience in the fields of science, medicine, chemistry, biology, biopharmaceutical or health supplements, the Director-

Defendants' understood that the Company's focus was not health or science or product based, and that the focus was the MLM structure.

118.    The Director Defendants agreed to be directors on the Board that is devoid of scientific education or experience, for a Company that represented itself as based upon cutting edge science.  By doing so, the Director Defendants understood that they were participating in a Company with minimal interest in science, and no executive officers with any scientific knowledge or experience.  The Director Defendants understood that they were participating in a Company that was almost exclusively interested in sales, and means of generating sales through the time proven multi-level marketing incentive arrangement, with little if any resources for, or interest in, creating products with actual scientifically validated health and medical benefits.

119.    The Director Defendants understood that the remarkable exponential explosion in sales revenues experienced by the Company from 2009 through 2014, amounting to a 5,168% increase in sales, was not due to any new invention or better marketing of products, but was the direct result of the adoption of the MLM structure in 2009.

120.    Because the Director Defendants participated in a Company they knew lacked any focus on science, and a Company that none the less falsely claimed to be focused on science, the Director Defendants have been compromised and are each involved in the wrongdoing herein alleged.  Because of their knowledge of and condonation of the Company's dependence upon the MLM structure and not the scientific or health efficacy of its products, the Director Defendants are not impartial in regards to any demand to take action against officers of the

Company for illegally utilizing the MLM structure in countries where such sales tactics are illegal.

121.    As such, the Director Defendants cannot be impartial in considering whether or not to take action against the wrongdoers in this case since the wrongdoing related to the MLM incentive scheme.

## Demand is Futile as to All the Director Defendants

122.    Demand is futile as to all the Director Defendants because each director understood and was aware that the Company was not focused on driving sales with the scientific effectiveness of the product, but with the motivation provided by the MLM structure.  This motivation was to increase third party distributors who were then tasked with finding more third party distributors, rather than actually selling the Company's product.

123.    The Director Defendants knew that the MLM structure was primary source driving Company sales, and that without the MLM structure the Company had generated less than 1/50th of the sales it generated with the MLM structure.  Accordingly, the Director Defendants were aware that the Company could not produce significant sales in countries prohibiting the MLM sales structure, without violating those laws.

124.    Since the Director Defendants understood that it was the MLM structure that was driving sales and not the Company's actual products (which claim to cure everything from cancer to dandruff), the Director Defendants understood that there could not be significant sales in a foreign country without use of the MLM structure.

125.     The Director Defendants knew that in the four foreign countries where MLM is illegal or so tightly regulated as to be basically illegal, the only way the Company could be generating significant sales and increases in revenues, was through the use of the MLM structure.

126.     As such, the Director Defendants were aware of and remained silent over the violation of the law that is the subject of the present lawsuit as well as the other shareholder derivative actions.

127.     As such, demand upon the Director Defendants is futile, and therefore excused.

**Demand is Futile as to Defendants Greer, Hegde and Lewis Because They Were on Notice of the Company's Inadequate Internal Controls Prior to Joining the Board**

128.     Demand is futile as to the newly appointed Board members, defendants Greer, Hegde and Lewis because at the time each was appointed to the Board on February 16, 2017, each of these defendants was on notice of the inadequate internal controls as a result of the pending Securities Class Action and shareholder derivative actions currently facing the Company.

129.     Despite the ongoing litigation facing the Company putting defendants Greer, Hegde, and Lewis on notice of the deficiencies in internal controls faced by the Company, these defendants still chose to join the Board that actively failed to ensure that the Company maintained adequate internal financial controls.

**Demand is Futile as to the Members of the Audit Committee**

130.     Demand is futile as to defendants Mauro, Beindorff and Okumoto as members of the Audit Committee during the Relevant Period (the "Audit Committee Defendants").

131.    The Audit Committee Defendants were responsible for, among other things, reviewing and approving quarterly and annual financial statements and earnings press releases, overseeing LifeVantage's internal controls over financial reporting, and discharging their other duties described herein. Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of false and/or materially misleading earnings press releases and earnings guidance, and failed in their specific duties to ensure that the Company's internal controls over financial reporting were sufficient and that statements made by the Company regarding its business and financial prospects were accurate. Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith. Any demand upon the Audit Committee Defendants therefore is futile.

### Demand is Futile as to all the Director Defendants
### <u>Because They Face a Substantial Likelihood of Liability</u>

132.    The Director Defendants face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its financial and business prospects were accurate.

133.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf, and none of them took any steps in a good faith effort to prevent or remedy that situation.

134.    The Director Defendants (or at the very least a majority of them) cannot exercise

independent objective judgment about whether to bring this action or whether to vigorously

prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this

Complaint, Plaintiffs have not made (and should be excused from making) a pre-filing

demand on the Board to initiate this action because making a demand would be a futile and

useless act.

135.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to

have occurred and participated in efforts to conceal or disguise those wrongs from the

Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs

complained of herein, and are therefore not disinterested parties.

136.    Each of the Director Defendants authorized and/or permitted the false statements to be

disseminated directly to the public and made available and distributed to shareholders,

authorized and/or permitted the issuance of various false and misleading statements, and are

principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully

prosecute such a suit even if they instituted it.

137.    Moreover, the Director Defendants as directors (and, in some cases, also as Audit

Committee members) owed a duty to, in good faith and with due diligence, exercise

reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls

and/or internal auditing and accounting controls over financial reporting were sufficiently

robust and effective (and/or were being implemented effectively), and to ensure that the

Audit Committee's duties were being discharged in good faith and with the required

diligence and due care. Instead, they knowingly and/or with reckless disregard reviewed,

authorized and/or caused the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.

138.    Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, the Director Defendants face a substantial likelihood of liability, making demand upon them futile.

139.    The Director Defendants also wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's executive officers and directors. The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

140.    The Director Defendants' making or authorization of false and misleading statements throughout the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability. If the Director Defendants were to bring a suit on behalf of LifeVantage to recover damages

sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile.

## COUNT I

### Against Defendants for Violations of Section 14(a) of the

### Securities Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder

141.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

142.  Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.  Specifically, the Company's 2016 and 2017 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material information regarding the wrongdoing of defendants, and included by reference materially false and misleading financial statements.

143.  The 2017 Proxy Statement, in describing the selection of directors for the Company's Board, states in pertinent part:

> In the ordinary course, absent special circumstances or a material change in the criteria for board membership, the nominating and corporate governance committee will recommend for nomination incumbent directors with skills and experience that are relevant to our business and who are willing to continue in service. If the nominating and corporate governance committee determines to seek one or more new director candidates who would add particularly desired skills, experience or attributes to our board, if an incumbent director is not willing to stand for re-election, or if a vacancy on our board of directors occurs between annual shareholder meetings and our board of directors determines to fill such vacancy, the nominating and corporate governance committee will generally identify the

desired skills and experience of a new nominee based on the criteria for board membership described above and any specific needs of our board of directors at the time. Under ordinary circumstances, the nominating and corporate governance committee will then seek suggestions from other members of our board of directors and our senior management as to individuals meeting such criteria.

2017 Proxy Statement, at 24.

144.    Though the 2017 Proxy Statement claims that directors are selected based upon their possession of "skills and experience that are relevant to our business," and the Company claims to be in a science based business, none of the Director Defendants have any skills or experience in science.

145.    The Company was primarily focused on promoting sales of its product through the MLM structure, rather than sales of a product with actual health efficacy.  The above cited 2017 Proxy Statement was false and misleading for representing that the Company selected directors based on skills and experience related to the Company's business which the Company repeatedly represented as being a science based health supplement business.

146.    In the exercise of reasonable care, defendants should have known that the 2016 and 2017 Proxy Statements contained misleading information and/or omitted material information.

147.    The misrepresentations and omissions in the 2016 and 2017 Proxy Statements were material to Company shareholders in voting on the 2016 and 2017 Proxy Statements.

148.    The Company was damaged as a result of the defendants' material misrepresentations and omissions in the 2016 and 2017 Proxy Statements.

## COUNT II

### Breach of Fiduciary Duty Against all Defendants

149.    Plaintiff incorporates by reference and realleges each and every allegation contained

above, as though fully set forth herein.

150.    The defendants owed and owe LifeVantage fiduciary obligations. By reason of their

fiduciary relationships, the defendants owed and owe LifeVantage the highest obligation of

good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

151.    The defendants violated and breached their fiduciary duties of good faith, fair dealing,

loyalty, due care, reasonable inquiry, oversight, and supervision.

152.    The defendants each knowingly, recklessly, or negligently approved the issuance of false

statements that misrepresented and failed to disclose material information concerning the

Company. These actions could not have been a good faith exercise of prudent business

judgment to protect and promote the Company's corporate interests.

153.    As a direct and proximate result of the defendants' failure to perform their fiduciary

obligations, LifeVantage has sustained significant damages. As a result of the misconduct

alleged herein, the defendants are liable to the Company.

154.    Plaintiffs, on behalf of LifeVantage, have no adequate remedy at law.

### COUNT III

### Against all Defendants for Unjust Enrichment

155.    Plaintiff incorporates by reference and realleges each and every allegation contained

above, as though fully set forth herein.

156.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense

of and to the detriment of LifeVantage.

157.    The defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to LifeVantage.

158.    Plaintiff, as a shareholder and representative of LifeVantage, seeks restitution from defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by defendants from their wrongful conduct and fiduciary breaches.

159.    Plaintiff, on behalf of LifeVantage, has no adequate remedy at law.

**COUNT IV**

**<u>Against all Defendants for Waste of Corporate Assets</u>**

160.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

161.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and on-going harm to the Company.

162.    As a result of the misconduct described above, the defendants wasted corporate assets by: (i) by paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

163.    As a result of the waste of corporate assets, the defendants are liable to the Company.

164.    Plaintiff, on behalf of LifeVantage, has no adequate remedy at law.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all defendants as follows:

A.      Declaring that Plaintiff may maintain this action on behalf of LifeVantage and that Plaintiff is an adequate representative of the Company;

B.      Determining and awarding to LifeVantage the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

C.      Directing LifeVantage and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect LifeVantage and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

> (1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

> (2) a provision to permit the shareholders of LifeVantage to nominate at least three candidates for election to the Board; and

> (3) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

D.      Determining and awarding to LifeVantage exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according

to proof at trial;

      E.      Awarding LifeVantage restitution from defendants, and each of them;

      F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      G.      Granting such other and further equitable relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

      Plaintiff hereby demands a trial by jury.

Dated this 24th day of April, 2017.

                                  */s/ Nelson Abbott*
                                  Nelson Abbott

### CERTIFICATE OF SERVICE

I hereby certify, this DayOrdinal day of Month, Year, that I served or caused to be served, a true and complete copy of the foregoing **CLICK HERE TO ENTER TEXT** by the manner indicated below:

Name/s                                          Delivery Method:
Company                                         Delivery Method
Address
City. ST  Zip
email/s.

Name/s
Company
Address
City. ST  Zip
email/s.

Name/s
Company
Address
City. ST  Zip
email/s.

Choose a building block (signatures).